UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

NABORS COMPLETION & PRODUCTION       §
SERVICES CO.,                        §
                                     §
        Plaintiff,                   §
VS.                                  §        CIVIL ACTION NO. 4:13-CV-1159
                                     §
CHESAPEAKE OPERATING INC, *et al*,   §
                                     §
        Defendants.                  §

## MEMORANDUM OPINION AND ORDER

## I.      INTRODUCTION

Before the Court are competing motions for summary judgment and responses of the defendants', Chesapeake Operating, Inc., and Great Plains Oilfield Rental, LLC ["Chesapeake"][Doc. Nos. 34 and 36], and the plaintiff's, Nabors Completion & Production Services, Co. ["Nabors"][Doc. Nos. 35 and 37].  After a careful review of the pleadings, motions for summary judgment, responses and proffered exhibits, the Court determines that Chesapeake's motion should be granted and Nabors' motion should be denied.

## II.     BACKGROUND FACTS AND CONTENTIONS OF THE PARTIES

On July 16, 2001, Chesapeake and Nabors entered into a Master Service Agreement ("MSA") setting out the terms and conditions under which Nabors, the Contractor, would furnish labor, services, equipment and supplies to Chesapeake, the Company, in support of Chesapeake's oil/gas drilling operations.  Under the terms of the MSA, Nabors and Chesapeake were obligated to provide appropriate insurance coverage

for liability claims that might be made against them.  *See* [5.0 Insurance].  Section 5.3 of

the MSA provides that all insurance, whether carried by the company or contractor, must

reflect the name of the other as an additional insured to the extent of their mutual

indemnification obligations contained in the MSA Indemnity provisions.  *See* [6.0

Indemnity].  Section 6.1 provides:

> It is agreed between Company and Contractor that certain
> responsibilities and liabilities for personal injuries and property
> damage arising out of the performance of this Agreement should
> be allocated between them in order to avoid protracted litigation
> between Company and Contractor along with the associated legal
> expenses and so that insurance or self-insurance may be arranged
> by each party as necessary to protect them against these exposures
> to loss. The following sets out the specifics of the agreements
> between Company and Contractor as to the allocation of the
> responsibilities and liabilities.

*See* MSA [6.1 Indemnity].  The word "following" is directive – it points to Sections 6.2

through 6.5 of the MSA where the separate "responsibilities and liabilities" of each party

are stated.  That understanding becomes relevant and conclusive as the Court construes

the MSA.

On or about March 22, 2011, a Nabors' employee was transporting a "frac tank"

[trailer] owned by Grant Plains Oilfield Rentals, but leased to Chesapeake, to a

designated work site when both driver-side tires on the trailer blew out allegedly causing

fire damage to third party properties.  Nabors contends that defective tires on the trailer

blew out causing the fire that damaged some 15,000 to 30,000 acres of private land.

Chesapeake counters that Nabors had a duty to inspect the trailer and the tires before the

transport.   Hence, Chesapeake claims that any defect in the tires should have been

discovered by Billy Bridge, Nabors' inspector and transporter.  Nabors disputes that any defect in the tires could have been detected by an inspection because the defects were latent defects.  In fact, Nabors asserts that Bridge did inspect the trailer and tires and found no visible defects.  Therefore, Nabors contends that the tires suffered latent defects. It relies on Section 2.3 of the MSA for recovery on its claim(s).

Following the accident, Nabors sued Chesapeake for breach of contract, asserting that it was due indemnity and/or contribution for the claims that it settled with third party property owners as a result of the alleged defective equipment supplied by Chesapeake. In support of its position, Nabors employed Rimkus Consulting Group, Inc., to prepare a Report of Findings and also employed Robert C. Chandler, a casualty adjustor, to settle the claims of the property owners.  According to Nabors, it has paid over $1.6 million in claims, and estimates that the damages will exceed $1.7 million.  Nabors' demands on Chesapeake for contribution or indemnify have been rebuffed and this suit followed.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248.  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Id.*   If the evidence rebutting the motion for summary judgment is

only colorable or not significantly probative, summary judgment should be granted.  *Id.* at 249-50; *see also Shields v. Twiss*, 389 F.3d 142, 149-50 (5th Cir. 2004).

Under Rule 56(c) of the Federal Rules of Civil Procedure, the moving party bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial."  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 - 87 (1986); *Adams v. Travelers Indem. Co. of Connecticut,* 465 F.3d 156, 163 (5th Cir. 2006).  In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson,* 477 U.S. at 255.

## IV.    DISCUSSION

### A.    *Contract Interpretation Texas Law*

Nabors sued Chesapeake contending that Chesapeake breached the terms of the MSA.   Under Texas law, governing diversity suits, state law rules of contract construction govern the interpretation of the parties' contractual agreement.  *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987)).  When interpreting a contract, courts scrutinize the contract as a whole in an attempt to effectuate the intent of the parties as expressed in the written instrument.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  "To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."  *Coker*, 650 S.W.2d at 393 (citing *Universal C.I.T. Credit Corp.*

*v. Daniel*, 243 S.W.2d 154, 158 (1951) (emphasis omitted).  Critical to this analysis are the words chosen by the parties.

If the parties' written contract is worded such that "it can be given a certain or definite legal meaning or interpretation," it is unambiguous and will be construed as a matter of law.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).   "The mere disagreement of the parties upon the meanings of contract terms will not transform the issue of law into an issue of fact."  *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992) (citing *Gen. Wholesale Beer Co. v. Theodore Hamm Co.*, 567 F.2d 311, 313 (5th Cir. 1978). "The question of whether a contract is ambiguous, [however], is one of law" *Toren v. Braniff, Inc.*, 893 F.2d 763, 765 (5th Cir. 1990).  Therefore, if a court finds the language of the contract unambiguous, a summary judgment is appropriate.  Fed. R. Civ. P. 56.

### B.    *Relevant MSA Provisions and Contentions*

As stated before, the parties agree that no genuine disputed fact issues requiring a fact finder is necessary to resolve this suit.  It is apparent, however, that the parties are at odds as to how those undisputed facts ought to be interpreted in light of certain provisions of the MSA.  The relevant provisions of the MSA are found in Section 2.0, "Labor, Equipment, Materials, Supplies and Services", and Section 6.0, "Indemnity." Specifically, Nabors contends that Section 2.3 must be read in the light of Section 6.1. The relevant portion of Section 2.3 reads:

> . . . Contractor agrees to visually inspect all materials and equipment furnished by Company directly employed in the course of operations conducted hereunder and shall notify

> Company of any apparent defects therein before using such materials and equipment. <u>Contractor shall assume no liability related to any Company provided materials and services. Contractor shall not be liable for claims due solely to latent defects</u>. [Emphasis supplied].

Nabors contends that when Section 2.3 is read in conjunction with Section 6.1, Chesapeake liability is established, either in indemnity or contribution, for money paid to settle the claims that resulted from the fire. Relevant portions of Section 6.1 read:

> It is agreed between Company and Contractor that certain responsibilities and liabilities for personal injuries and property damage arising out of the performance of this Agreement should be allocated between them . . . <u>The following sets out the specifics of the agreements between Company and Contractor as to the allocation of the responsibilities and liabilities</u>.   [Emphasis supplied]

The disclaimer in Section 2.3 that Nabors relies on – "Contractor shall assume no liability related to any Company provided materials and services" – does not relate to equipment. The parties took great care in their choice of words in preparing the MSA. If the parties had intended that the word "equipment" be included in that sentence they would have done so.   The preceding sentence does include the word "equipment." Hence, there can be no claim of error or confusion. *Coker*, 650 S.W.2d at 393. The same logic applies to the last sentence of Section 2.3. It states "Contractor shall not be liable for claims due solely to latent defects." This language captures the materials, services and equipment supplied by the Company. The trailer tires in question are subject to this latter provision of Section 2.3. Therefore, the Court looks to the summary judgment evidence to determine whether a disputed fact issue arises concerning the parties'

intentions necessitating a jury trial.  In making this determination, the Court relies on the testimony of Billy Bridge and the expert report of Brian A. Darr.

### C.    *Relevant Undisputed Evidence*

The evidence shows that prior to transporting the trailer to its intended location, Billy Bridge inspected the tires for defects.  His inspection did not reveal that the tires were suffering dry rot, weather cracks, inadequate thread or that they had missing chunks of rubber.  His deposition testimony reflects the following exchange:

. . .

Q     All right. So the basic rule – and I'm not trying to put words in your mouth, here, but if there's anything wrong safety-wise with the tank, you don't take it?

A     Exactly.

Q     And you don't have any leeway on that, correct?

A     No.

Q     It's either in compliance or not in compliance?

A     Yes.

*See* [Doc. No. 34-1, page 42, lines 13-23]

. . .

Q     Okay.   You said they looked at this as an uncontrollable accident?

A     Yes

Q     Why did you say that?

A     Because, like I said, with tires, good tires, if you got air pressure and you see no visible damage, cuts, marks, anything like that, there's nothing you could do

to stop that, I mean, other than what I had already
done.

. . .

Q    Do you feel that – based on your personal inspection
of these tires, do you feel that they were improperly
maintained?

A    That they were properly maintained?

Q    Yes, sir.

A    No.

Q    Or that Chesapeake or the oil field service – or, Great
Plains didn't properly take care of them?

A    No, I don't feel that way.

. . .

*See* [Doc. No. 34-1, page 46, lines 2-10 and 14-23].

In addition to Bridge's testimony, the Court reviewed the "Report of Findings"
prepared by Brian A. Darr of Rimkus Consulting Group, Incorporated for the benefit of
Nabors.   After an analysis of the MSA, the testimony given by Bridge and the
conclusion(s) offered by Darr, the Court's concludes that Chesapeake is not liable to
Nabors for contribution or indemnity.

### D.    *The Court's Analysis*

The undisputed evidence shows that Bridge inspected the tires on the trailer prior
to beginning the trip.   The evidence also shows that the 60 mile trip, from pick-up to
delivery, required about two hours travel time [Doc. No. 34-1 at page 22, lines 5-10].

Bridge testified that he made two stops before the blowouts occurred – one at Arnett, the other at a Quick Stop for food.  While His testimony does not reveal specifically where along the 60 mile trip the stops occurred, it is clear that the tires blew at "probably 30 miles . . . [or] halfway to the – where [Bridge] needed to set it."  *See* [Doc. No. 34-1, deposition page 27, lines 11-12].  Bridge testified that on both stop he "walked around the trailer . . . [and] check[ed] everything."  [*Id.* at lines 20-22].  Nothing out of the ordinary was visible or apparent to him.

The expert report prepared by Darr does not contradict Bridge's testimony.  Darr concluded, that at the point when the tires failed, the driver lost control of the trailer and its bottom came in contact with the roadway creating sparks that ignited the fire.  He opines that both tires did not necessarily fail at the same time.  One possibly failed causing an overload on the other resulting in a total failure.  Darr reports the following conclusions: (1) the tires were purchased in 2008 (apparently indicating age not a factor); (2) the tires showed a bluing and wrinkling in the sidewalls due to overdeflection (either underinflation, overloading or heat); (3) the tires were trailer tires, therefore, use for hauling a frac tank trailer was an acceptable use; (4) it is likely that both tires did not fail at the same time – one was running flat causing an overload and the subsequent failure of the second tire; and, (5) the exact cause of the failure of the tires is unknown.

Darr's report makes clear that the "bluing" and "wrinkling" in the sidewalls of the tires do not establish a "preexisting condition".  That observation means that tire failure could have been caused by a number of factors including overheating due to underinflation, overload or negligent driving on the part of Bridge.  His findings, coupled

with Bridge's testimony, do not establish that the tires were improperly maintained. They suggest that underinflation, not a latent defect, caused the failure. A proper inspection of the tires would include checking for underinflation. Bridge may or may not have checked the tires for proper inflation.

Nabors must establish that the tire failure was due solely to a latent defect. In order for Nabors to meet that burden it must eliminate other causes such as road and weather conditions, overload, even negligence on the part of Bridge. Nabors has failed to do so. The evidence does not support the conclusion that the accident was due solely to latent defects. While the cause of the failure is unknown and perhaps unknowable, that alone does not establish that the tires had latent defects. Nor does it exclude that possibility. However, there is no evidence that a latent defect was the sole cause of the accident.

Nabors also argues that Chesapeake owes contribution. The Court reads Section 6.1, "allocation of responsibilities" to mean that Chesapeake has no shared liability with Nabors. The language refers to loss allocations attributable separately, to each party. The term "allocation", therefore, refers to responsibility not joint liability. This is apparent when one examines Sections 6.2 and 6.3 and 6.4 and 6.5 of the MSA. Section 6.2 addresses loss allocation where claims arise against Nabors from its employees, its contractors or its employees or its invitees. Likewise, Chesapeake is responsible for losses when claims are made by Chesapeake's employees, contractors or its employees or invitees. Of course Nabors as a contractor is excluded from the contractor group by reason of the MSA. Sections 6.4 and 6.5 also speak to the separate responsibilities of

Chesapeake and Nabors.  Each is bound by its separate acts that give rise to claims in favor of third parties or persons not employed by the Contractor or Company.

## V.    CONCLUSION

The Court reads the MSA as an agreement that seeks to avoid confusion regarding responsibilities where claims are made.  Hence, it does not anticipate joint and several liability on the part of the parties or contribution.  To hold otherwise defeats the intentions of the parties expressly stated in Section 6.1 that responsibilities for claims have been allocated to avoid litigation between the company and contractor.

The Court concludes that because the undisputed evidence fails to establish that the accident was due "solely" to latent defects in Chesapeake's trailer tires, Nabors' motion for summary judgment should be denied and Chesapeake's motion should be granted.

It is so Ordered.

SIGNED on this 26th day of February, 2015.

_____
Kenneth M. Hoyt
United States District Judge